IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BRIAN D. KIEHL              *
                           *
v.                         *      Civil Action No. WMN-13-2914
                           *
ACTIONET, INC.             *
                           *
                           *
   *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

MEMORANDUM

Before the Court is Defendant ActioNet, Inc.'s Motion for Summary Judgment.  ECF No. 31.  The motion is fully briefed and ripe for review.  Upon a review of the papers, facts, and applicable law, the Court determines (1) that no hearing is necessary, Local Rule 105.6, and (2) because there are genuine disputes of material facts, the motion will be denied.

**I.  FACTUAL AND PROCEDURAL BACKGROUND**

Brian Kiehl (Kiehl), a Navy reservist, brings this action pursuant to the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301 et seq. (USERRA), alleging that defendant ActioNet, Inc. (ActioNet) failed to permanently hire him because of his required annual training as part of the Reserves.  Kiehl was hired by a staffing agency, Apex Systems (Apex), to work for ActioNet to execute a contract with the Department of Energy (DOE).  Kiehl was hired as the Cyber Security Operations Manager on a "temp-to-perm" basis.  In the

relationship between APEX and ActioNet, staffing secured by APEX

was hired on a 90-day temporary basis, after which ActioNet had

the option to hire the employee on a permanent basis.  The act

of switching an employee from temporary to full-time employment

was referred to as "converting" an employee.

Before he was hired, Kiehl was interviewed by Bill Lakner

and Steve Reinkemeyer.  Kiehl reported his reservist status and

it was noted on his resume.  During the interview, Lakner and

Reinkemeyer made positive comments regarding Kiehl's service in

the Navy, as both were Navy veterans themselves.  Reinkemeyer

remarked that both felt that military service fostered

leadership skills.  ActioNet has a history of hiring military

veterans, and in 2012-2013 handled forty instances of military

leave for varying lengths of time.

In his position as Cyber Security Operations Manager, Kiehl

was expected to lead three teams of ten personnel to execute a

contract ActioNet had with the DOE for cybersecurity services.

Specifically, Kiehl was expected to ensure that certain task

order deliverables were being accomplished.  ActioNet was taking

over the contract from another federal contractor who had

abandoned the project.  Reinkemeyer served in a consultant

position as the Transition Manager and Lakner as the Project

Manager. Only Lakner was an employee of ActioNet.  Kiehl was

also expected to act as liaison between the ActioNet team,
Lakner, and Brian Varine, a DOE contact.

The nature of Kiehl's performance while working for
ActioNet is much disputed.  In his deposition, Lakner points to
multiple incidents that were factors in his decision to not
convert Kiehl to a fulltime position.  First, Lakner recalls
that Brian Varine said he did not know what Kiehl was supposed
to be doing.  Lakner characterizes Kiehl's communications with
Varine as "not very much of a dialogue."  He also recounts that
team leads were occasionally unable to find Kiehl and that he
"did not provide them with direction or guidance."  ECF No. 31
at 5.

Lakner stated that Kiehl was underperforming on two
unfinished projects: the "skills matrix" and Standard Operating
Procedures (SOPs).  The skills matrix project required Kiehl to
interview the team members, gather information regarding their
education and training backgrounds, and place the information in
an Excel spreadsheet.  Before his termination, Kiehl interviewed
6-15 people, and did not submit a finished product.  There was
no deadline beyond "as quickly as possible."  ECF No. 31 at 11.
Kiehl was also tasked to insure that the project's Standard
Operating Procedures (SOPs) were completed by team members.  At
his termination, there was one unaddressed draft of a SOP.
Kiehl characterizes these projects as "paperwork."

Kiehl maintains that he had a generally positive working relationship with his co-workers, supervisors, and DOE contacts. He states that on multiple occasions, he received positive feedback from Reinkemeyer, Whitney Gray, ActioNet's Interagency Coordinator, and David Broussard, Apex Account Executive. Reinkemeyer maintains that Kiehl spoke several times about perceived shortcomings.  All references in writing to Kiehl's job performance, both positive and negative, are dated after his firing.

From late August up to Kiehl's October termination, Kiehl maintained an ongoing correspondence with ActioNet's Human Resource (HR) Department regarding potential interference between his required Reserve training and his conversion from temp to permanent employee.  In August 2012, Kiehl received his annual military training assignment from the Navy, to commence on October 29, 2012. He was timed to convert to a full-time employee on October 27.  He then e-mailed ActioNet's Recruiting Manager Anthony Pierouchakos to confirm that the military service would not interfere with his conversion date to permanent employee.

Internal e-mails from ActioNet show that the HR team was less than enthusiastic about finding a solution to accommodate both Kiehl's start date and his military leave.  One Senior HR employee stated "I would think we would want to wait to convert

him until after he gets back," commenting that it "[s]eems strange to hire him and then immediately send him on leave." ECF No. 37 at 14.  Pierouchakos explored the option of having APEX pay for Kiehl's leave.  Discussion centered on the administrative and cost burden of handling Kiehl's military service so soon after full instatement.  From the record, it appears that this correspondence remained within the HR Department until October 2, when Pierouchakos forwarded Kiehl's latest e-mail to Lakner and Reinkemeyer with the sentence "We need to figure out a time to let this guy go."  ECF No. 37-6 at 2.

In Mid-September, Kiehl had to take three days of unpaid leave to complete a mandatory Navy training program.  Kiehl characterizes Reinkemeyer's reaction to his leave as "exasperation."  ECF No. 37 at 14.  Reinkemeyer called Kiehl multiple times while Kiehl was out on duty with work issues.

On September 27th or 28th, Kiehl notified Reinkemeyer for the first time of his training schedule.  Reinkemeyer's alleged response was that "Bill [Lakner] is going to shit his pants" when he found out.  ECF No. 1 ¶ 19.  Reinkemeyer and Kiehl decided to offer to put Jesse Lim, one of the three team leaders, in as Lakner's temporary replacement "to soften the blow" when Lakner was informed of the training.  ECF No. 37-9 at 17.  Lakner was not present for the conversation.

Kiehl was discharged on October 2nd, effective immediately. It is disputed as to the timing of the actual decision not to convert Kiehl from temporary to full time.  Lakner states that he alone made the decision in or around the middle of September 2012, after receiving input from Reinkemeyer and Varine.  Kiehl, on the other hand, stresses that, in the absence of prior negative assessments and in light of the temporal proximity to his training disclosure to Reinkemeyer on the 27th or 28th, the decision was made in the short time window between his disclosure and termination.  After his termination, Kiehl filed a complaint with the Department of Labor for his discharge. During the investigation, ActioNet maintained that the reason for Kiehl's firing was due to underwhelming performance.

## II.  LEGAL STANDARD

Summary judgment is appropriate if the record before the court "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 377 U.S. 317, 322-23 (1986).  A fact is material if it might "affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining whether there is a genuine issue of material fact, the Court "views all facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party."

6

Housley v. Holquist, 879 F. Supp. 2d 472, 479 (D. Md. 2011)

(citing Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282,

1286 (4th Cir. 1987)).

**III. DISCUSSION**

USERRA provides a "comprehensive remedial scheme to ensure

the employment and reemployment rights of those called upon to

serve in the armed forces of the United States." Francis v.

Booz, Allen & Hamilton, Inc., 452 F.3d 299, 303 (4th Cir. 2006).

Specifically, USERRA prohibits employers from denying "retention

in employment, promotion, or any benefit of employment by an

employer on the basis of [uniform services] membership . . . or

obligation." 38 U.S.C. § 4311(a). An employer is considered to

have taken a prohibited action when the employee's "obligation

for service is a motivating factor in the employer's action,

unless the employer can prove that the action would have been

taken in the absence of such . . . obligation for service." Id.

at (c)(1). USERRA thus establishes a burden shifting scheme, in

which Kiehl first must show that his military obligation was

"one of the factors that a truthful employer would list if asked

for the reasons for its decision." Bunting v. Town of Ocean

City, 409 F. App'x 693, 695-96 (4th Cir. 2011); see also Hance

v. Norfolk Southern Ry. Co., 571 F.3d 511, 581 (6th Cir. 2009).

Then, ActioNet must demonstrate "by a preponderance of the

evidence that the stated reason was not a pretext." Velazquez-

Garcia v. Horizon Lines of P.R., Inc., 473 F.3d 11, 17 (1st Cir. 2007).

In the light most favorable to Kiehl, he has met his burden to show that his protected status was a motivating factor in the decision not to convert him.  In establishing the prima facie case, "circumstantial evidence will often be a factor . . . for discrimination is seldom open or notorious." Sheehan v. Dep't of Navy, 240 F.3d 1009, 1014 (Fed. Cir. 2001).  The opinion continues by describing the variety of factors which may be considered, including:

> "proximity in time between employee's military
> activity and the adverse employment action,
> inconsistencies between the proffered reasons and
> other actions of the employer, an employer's expressed
> hostility towards members protected by the statute
> together with knowledge of the employee's military
> activity, and disparate treatment of certain employees
> compared to other employees with similar work records
> or offenses." Id.

Kiehl has maintained that the close temporal proximity between the disclosure of his military service to Reinkemeyer and his termination, just two days later, sufficiently establishes that such service was a "motivating factor" in his termination.  ActioNet argues that temporal proximity is not enough and even if it was, Lakner had made his decision not to hire by the middle of September.  The Court declines to address whether temporal proximity alone may be considered sufficient to show that a military obligation was a "motivating factor" in a

8

negative employment decision, as there is additional circumstantial evidence beyond temporal proximity from which a fact finder might find for Kiehl.

To begin with temporal proximity: the two business day window between Kiehl's disclosure and his termination is close enough to support a finding that his military obligation was a "motivating factor." See Maxfield v. Cintas Corp. No. 2, 427 F.3d 544, 552 (Finding that transfer the day upon returning from military leave close enough to establish causation); Baylor v. General Anesthesia Services, Inc., Civ. No. 04-1265, 2006 WL 2290707 at *2 (S.D.W. Va. Aug. 8, 2006) (Finding that plaintiff's burden met when adverse employment action occurred a day before deployment). ActioNet avers that this association does not apply, since Lakner made the decision not to convert Kiehl by mid-September. As discussed below, however, a jury may find Lakner's testimony regarding the timing of his decision to be less than credible. Furthermore, the lack of recorded evidence of Kiehl's shortcomings made during the time of employment and Kiehl's recollections of positive feedback is inconsistent with the post-termination declarations of ActioNet in subsequent investigations. Sheehan, 240 F.3d at 1014 (Identifying "inconsistencies between proffered reasons and other actions of the employer" as a factor from which discriminatory intent might be inferred). Finally, a finder of

9

fact could decide that Reinkemeyer's reaction to Kiehl's September absence for mandatory training combined with his scatological exclamation on the 27th or 28th and his role in advising Lakner to not convert Kiehl demonstrates hostility towards Kiehl as a Navy reservist notwithstanding ActioNet's reputation in the community for employing military servicemen. See Sutherland v. SOS Int'l, Ltd., 541 F. Supp. 2d 787, 793 (E.D. Va. 2008) ("If, shortly before Defendants made the decision to terminate Plaintiff, a meeting or conversation occurred in which Defendants came to a new realization about the extent of his reservist obligations, a reasonable finder of fact could conclude that the conversation led to Plaintiff's termination, even when viewed alongside Defendants' evidence that Plaintiff's job performance was unsatisfactory.").

As there is sufficient evidence that a fact finder could decide that Kiehl's military obligation was a factor in his termination, the burden now shifts to ActioNet to determine whether the termination would have occurred absent his required training obligation.  Here, the arguments and facts raised by ActioNet give the Court sufficient pause that summary judgment is not warranted in this case.  The essence of ActioNet's argument that the decision to terminate Kiehl would have occurred absent his military obligation boils down to two points: (1) that Lakner had made his decision prior to being

informed of Kiehl's training schedule and (2) Kiehl was a sub-par manager.  A review of the facts, however, show inconsistencies in testimony whose merit is best left to a jury to determine.

In his affidavit, Lakner states that around or during the middle of September, he made the decision not to convert Kiehl to a full-time position.  During his deposition, Lakner stated that he had "a couple" discussions with Reinkemeyer and Pierouchakos before arriving at his decision.  Kiehl's recollection of Reinkemeyer's reaction to the training schedule, however, is inconsistent with someone who was aware of Lakner's non-conversion decision.  Specifically, the comment relating to the extent of Lakner's surprise upon hearing the news and the plan to suggest Jessie Lim act as operating as interim operations manager signal either that Reinkemeyer was out of touch with Lakner, or at the time of Kiehl's disclosure, Kiehl's conversion was still moving forward.

It is also not as clear-cut as ActioNet would have it that Kiehl was an underperforming, ineffective leader.  Lakner testified to having multiple conversations with DOE contact Brian Varine and ActioNet team members as to Kiehl's failure to lead and occasional absences, but does not recall specific details or conversations.  Reinkemeyer similarly recalls occasions of complaints about Kiehl's performance but does not

remember the time, place, or people involved.  On the other hand, Kiehl maintains that he only received positive comments and praise.  There is no written record prior to Kiehl's termination of his performance, either positive or negative.

In addition, ActioNet would interpret Kiehl's deposition testimony as an acknowledgement of his own failure as a leader. When asked, Kiehl confirmed that the DOE project was disorganized when he left ActioNet, as it was when he began his job.  Kiehl also testified that many team members were waiting on hardware and software necessary to begin work.  A finder of fact, learning about the DOE project and Kiehl's role, could conclude that the continuing disorganization was due to Kiehl's performance or, in the alternative, that the situation could not be fixed by one Operations Manager in 71 days of employment.

In light of the evidence in the record, the Court finds that a reasonable jury may conclude that Kiehl's training obligation was a "motivating factor" in the decision not to convert him to full time status, and that ActioNet's reason of sub-par work performance was pretextual.  As there are outstanding questions of sufficiency, weight, and probity of evidence in this case that ultimately bear on any finding as a matter of law, the Court will deny ActioNet's motion.  Liberty Lobby, 477 U.S. at 255 ("Credibility determinations, the

weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions.").

## IV. CONCLUSION

For the reasons stated above, the Defendant's Motion for

Summary Judgment will be denied.  A separate order shall issue.


_____/s/_____
William M. Nickerson
Senior United States District Judge

DATED: November 17, 2014